### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF LOUISIANA

**MEGAN ESTAY and FRANCESCA MESSORE,**
**individually and as a representative of a class**
**of participants and beneficiaries on behalf of the**
**Ochsner Clinic Foundation 401(K) Plan,**

                                        **Civil Action No. 2:25-cv-00507-JTM-JVM**

                  **Plaintiffs,**                                **CLASS ACTION**

**v.**

**OCHSNER CLINIC FOUNDATION,**
**RETIREMENT BENEFITS COMMITTEE, and**
**DOES 1 to 10 inclusive,**

      **Defendants.**

## PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT

1.      Plaintiffs, Megan Estay and Francesca Messore (together, "Plaintiffs"), individually and as representatives of a class of participants and beneficiaries of the Ochsner Clinic Foundation 401(k) Plan (the "Plan") bring this Employee Retirement Income Security Act of 1974 ("ERISA")[1] action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3) and Rule 23 of the Federal Rules of Civil Procedure against Defendants, Ochsner Clinic Foundation ("Ochsner"), and the Retirement Benefits Committee (the "Committee") (together, "Defendants"), for (1) breach of ERISA's fiduciary duties; and (2) engaging in self-dealing and transactions prohibited by ERISA.

---

[1] 29 U.S.C. §§1001–1461.

1

2.      ERISA requires a fiduciary to act "solely in the interest of participants," to do so with "the care, skill, prudence, and diligence" of a prudent person, "in accordance with the documents and instruments governing the plan," and to refrain from "deal[ing] with the assets of the plan" in the fiduciary's own interest. 29 U.S.C. §§ 1104(a)(1); 1106(b)(1). These duties of loyalty and prudence are the "highest known to the law." *Bussian v. RJR Nabisco, Inc*., 223 F.3d 286, 294 (5th Cir. 2000) *(quoting Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982)). These duties require fiduciaries to have "an eye single to the interests of the participants and beneficiaries", *Donovan*, *supra*, 680 F.2d at 271, and "to deal fairly and honestly with beneficiaries," *Cunningham v. Cornell Univ*., 604 U.S. 693, 696 (2025) ("*Cunningham*").

3.      The Supreme Court and Fifth Circuit warn ERISA fiduciaries that they are not immunized from their duties to exclusively act in the best interest of plan participants when they purport to adhere to a plan document or because the conduct at issue is not prohibited by ERISA. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014) (explaining that compliance with a plan document does not necessarily mean a fiduciary has discharged its duties with the prudence required under ERISA); *Bussian*, 223 F. 3d at 295 ("[S]imply because ERISA allows an employer to [take an action] does not mean that a fiduciary's acts undertaken . . . may deviate from ERISA's command that a 'fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries.'") (quoting 29 U.S.C. § 1104(a)).

4.      ERISA "Section 1106 supplements [a] fiduciary's general duty of loyalty to the plan's beneficiaries . . . by categorically barring certain transactions deemed 'likely to injure the pension plan.'" *Cunningham*, 604 U.S. at 697.

5.      As detailed below, instead of loyally and prudently acting in the best interest of Plan Participants and avoiding prohibited transactions, Defendants chose to use Plan assets  to

2

benefit Ochsner, to the detriment of the Plan and its participants, by using over $14.3 million of Plan assets to offset Ochsner's contractual obligations to make declared matching contributions to the Plan, while disclosing no use of Forfeited Plan Assets to defray Plan expenses and requiring Plan Participants to pay over $11.5 million in compensation to the Plan's third-party service providers, both directly and indirectly, that should never have come out of their accounts. Even more egregious, during the class period, Defendants had millions of dollars of leftover forfeitures available at the end of each year that could have defrayed substantial portions of Plan participants' expenses even after they enriched Ochsner with over $14.5 million in Plan assets.

6.      To remedy these fiduciary breaches and ERISA violations, Plaintiffs, individually and as representatives of a class of participants and beneficiaries of the Plan, bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plans any profits made through Defendants' use of the Plan's assets. In addition, Plaintiffs seek such other equitable or remedial relief for the Plan as the Court may deem appropriate.

### **JURISDICTION, VENUE, AND ERISA EXHAUSTION**

7.      This Court has exclusive subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq*.

8.      This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

9.      Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

10.     Plaintiffs are not required to exhaust administrative remedies under the Plan or ERISA before filing this lawsuit for ERISA statutory fiduciary breaches and prohibited transactions under ERISA, *see* ECF No. 42 at 19 ("Plaintiffs' claims are not disguised claims for additional benefit, and exhaustion is therefore not required.").

## PARTIES

11.     The Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34) that covers eligible employees of Ochsner and is subject to the provisions of ERISA pursuant to 29 U.S.C. § 1103(a).

12.     Plaintiff Megan Estay is a citizen of the State of Louisiana, is currently employed by Ochsner since May 2018, and has been a participant in the Plan during the class period. As such, she is a participant under ERISA § 3(7), 29 U.S.C. § 1002(7).

13.     Plaintiff Francesca Messore is a citizen of the State of Louisiana, was previously employed by Ochsner until 2019, and was a participant in the Plan during the class period. As such, she is a participant under ERISA § 3(7), 29 U.S.C. § 1002(7).

14.     During the class period, Plaintiffs' individual accounts were charged, and Plaintiffs paid, for a share of the Plan's administrative expenses while also paying indirect compensation to for the Plan's administrative expenses which also reduced the amount of their benefits available for retirement.

15.     Plaintiffs have Article III standing to bring this action on behalf of the Plan because they suffered actual injuries through the misallocation of Plan assets by Defendants with regard to the Plan as it relates to their individual 401(k) accounts. This injury is fairly traceable to

Defendants' unlawful conduct in using Plan assets for their own benefit and this harm is likely to be redressed by a favorable judgment providing appropriate equitable relief to the Plaintiffs and to the class.

16.     Having established Article III standing, Plaintiffs may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond their own injuries.

17.     The Plaintiffs and all participants in the Plan did not have knowledge of all material facts (including, among other things, the misallocation of Plan assets in the form of forfeitures) necessary to understand that Defendants breached their fiduciary duties until shortly before this suit was filed.

18.     Having never managed a very large 401(k) Plan, Plaintiffs, and all participants in the Plan, lacked actual knowledge of how Plan forfeitures should be allocated by the Defendants and also lacked actual knowledge of how Plan forfeitures were used by the Defendants.

19.     Ochsner is a Louisiana-incorporated company with its principal place of business at 1514 Jefferson Hwy., BH 543, New Orleans, LA 70121-2429.

20.     Ochsner is the Plan sponsor under 29 U.S.C. § 1002(16)(B) and the Committee is the Plan Administrator under 29 U.S.C. § 1002(16)(A) with broad authority over the administration and management of the Plan.

21.     The Committee was created by Ochsner to assist in the management of the Plan and was delegated with authority to, among other things, direct the trustee with respect to crediting and distribution of the Plan assets.

22.     Ochsner and the Committee are both named fiduciaries of the Plan and each exercised discretionary authority and discretionary control over the management and

administration of the Plan with respect to the matters alleged herein and were fiduciaries of the Plan within the meaning of 29 U.S.C. § 1002(21)(A). Hereafter, a person or group of people who exercise authority or control of Plan assets will be referred to as a "Plan Fiduciary" or "Plan Fiduciaries."

23.     The defendants sued by the fictitious names DOES 1 through 10, inclusive, are Plan Fiduciaries unknown to Plaintiffs who exercise or exercised discretionary authority or discretionary control respecting the management or disposition of its assets, or have had discretionary authority or discretionary responsibility in the administration of the Plan and are responsible or liable in some manner for the conduct alleged in this Complaint. Plaintiffs will amend this Complaint to allege the true names and capacities of such fictitiously named defendants when they are ascertained.

### ERISA'S PURPOSE AS APPLIED TO DEFINED CONTRIBUTION PLANS

24.     ERISA was enacted in 1974 to safeguard the interests of the beneficiaries of pension plans broadly, which includes defined contribution plans and 401(k) plans such as the Plan, and imposes standards of conduct on plan fiduciaries.

25.     ERISA includes a required disclosure framework to ensure that retirement plan participants can hold plan fiduciaries accountable for fulfilling their duties required under ERISA because it recognizes that plan participants and beneficiaries will often not have access to details about the conduct of plan fiduciaries. Accordingly, to ensure participants can hold fiduciaries accountable courts recognize that inferences may often be required from limited publicly available information. *See Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995) ("Where a fiduciary exercises discretionary control over a plan, and assumes the responsibilities that this control entails, the victim of his misconduct often will not, at the time he files his complaint, be in a

position to describe with particularity the events constituting the alleged misconduct."); *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106-107 (2d Cir. 2021) ("([W]e are cognizant that ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences" and "a claim under ERISA may withstand a motion to dismiss based on sufficient circumstantial factual allegations to support the claim, even if it lacks direct allegations of misconduct.").

26. Over the past several decades defined contribution plans, like the Ochsner 401(k) Plan, have become the primary savings vehicle for most Americans. By 2022 there were more than 121 million participants who were relying on benefits from defined contribution plans to provide some or all of their retirement benefits. *See* https://www.congress.gov/crs-product/R48470; *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008) ("Defined contribution plans dominate the retirement plan scene today.").

27. Defined contribution plans allow employees to defer the payment of taxes on compensation contributed to the Plan. As a result, there are many IRS rules and regulations that define the requirements a plan must follow in order to receive the benefit of deferring taxes on contributions. To the extent that employers agree to make contributions to defined contribution plans the employers also receive a tax benefit.

28. A defined contribution plan "provides for an individual account for each participant and for benefits solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeiture of accounts of other participants which may be allocated to such participant's account." 29 U.S.C. § 1002(34). As such, a participants' retirement account in a defined contribution plan equals (1) the amount of the participants' voluntary contributions; plus (2) the amount of any employer contributions; plus (3) any

7

investment returns on those contributions; minus (4) plan and investment expenses paid to third-party service providers. *Cunningham*, 604 U.S. at 697-98 (explaining that defined contribution participants "maintain individual investment accounts within those plans, the value of which is determined by the market performance of employee and employer contributions, less expenses. Those expenses include fees paid to service providers.").

29. In addition, employers, like Ochsner, also derive many other indirect benefits by virtue of sponsoring defined contribution plans. For example, in addition to tax benefits it is well known that retirement plans are critical tools for employers to attract and retain high quality employees.

30. While all defined contribution plans are drafted with a provision that provides the employer/sponsor the right to terminate the plan at any time, in practice plan sponsors rarely terminate plans because doing so would put them at a substantial competitive disadvantage and make it much more difficult to attract and retain talented employees.

31. As relevant to this case, under the circumstances prevailing well prior to the class period, it was and is understood that it is in the best interest of plan participants to enable them to participate in the potential for market earnings sooner rather than later and that general understanding applies to both contributions from employees as well as the allocation of Forfeited Plan Assets and employer contributions.

32. For example, ERISA and DOL regulations reflect a clear and longstanding policy intent to ensure that the deferrals of Plan Participants are promptly invested pursuant to the direction each Plan participant and are not allowed to sit in unallocated plan-level accounts, which are typically invested in cash or a cash equivalent thereby depriving Plan Participants from the potential for investment earnings. *See, e.g.*, DOL Advisory Opinion 2002-02A (requiring that plan

fiduciaries minimize the time between employee deferrals and investment pursuant to plan participant direction); see also 29 C.F.R. § 2510.3-102 (noting that plan assets "include participant contributions as of the earliest date they can reasonably be segregated" from the employer's general assets); Field Assistance Bulletin 2008-01 (noting that participant contributions "that are withheld from wages or paid to the employer are delinquent if they become plan assets while still in the hands of the employer").[2]

33.     Additionally, as relevant to this case, under the circumstances prevailing well prior to the class period, it was and is understood that plan expenses can have a dramatic detrimental impact on the retirement benefits provided by defined contribution plans. For example, according to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes a difference of 28% in savings at retirement.[3] Over a 40-year career, this difference in fees can reduce a participant's retirement savings by almost $500,000.[4]

---

[2] *See also*, IRS "Retirement News for Employers," Vol. 7, Spring 2010 (stating forfeitures "must be used or allocated in the plan year incurred. The Code does not authorize forfeiture suspense accounts to hold unallocated monies beyond the plan year in which they arise."); 29 C.F.R. § 2510.3-102 (61 Fed. Reg. 41220, Aug. 7 1996) (noting that "the Department is concerned that participant contributions be paid promptly into the plan so as to begin to earn interest or other investment returns and to be available for the payment of benefits."); Field Assistance Bulletin No. 2002-03 (noting concern about interest earned "on contributions pending investment direction" and requiring that float be "regarded by plan fiduciaries and service providers as part of the service provider's compensation"). Accordingly, interest (float) earned on Forfeited Plan Assets sitting in an unallocated plan-level account both inures to the benefit of the employer when the plan fiduciaries use that interest (float) to reduce the employer's contributions and also deprives plan participants of the potential for investment earnings.

[3] U.S. Dept. of Labor *A Look at 401(k) Plan Fees,* at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/401k-plan-fees.pdf.

[4] Michael Bird, *Pandemic Highlights Reasons for Reviewing Plan Fees,* PLANSPONSOR, May 15, 2020, https://www.plansponsor.com/pandemic-highlights-reasons-reviewing-plan-fees/, *archived at*https://perma.cc/8VCU-E7PC.

## FIDUCIARY STANDARD REQUIRED UNDER ERISA AND FIFTH CIRCUIT

34.    ERISA was enacted to protect the interests and benefits of employee benefit plan participants and established very important minimum standards for the conduct of plan fiduciaries. *See e.g.*, *Spence v. Am. Airlines, Inc.*, 718 F. Supp. 3rd 612, 617 (N.D. Tex. 2024) ("The primary purpose of ERISA is to protect participants and beneficiaries of employee retirement plans.") (citing P*ilot Life Ins. Co v. Dedeaux*, 481 U.S. 41, 44 (1987)).

35.    Under ERISA, a person is a fiduciary to the extent he or she: (1) exercises any discretionary authority or control over management of the Plan or the management or disposition of its assets; (2) renders investment advice regarding Plan assets for a fee or other direct compensation, or has the authority or responsibility to do so; or (3) has any discretionary authority or control over Plan administration. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Accordingly, Ochsner, as Plan Sponsor and as Plan Administrator, is a fiduciary (hereafter "Plan Fiduciaries" or "Defendants"). 29 U.S.C. § 1002(21)(A).

36.    Under ERISA's strict fiduciary duty requirements, when making the decision regarding the use of Plan assets, Defendants are required by ERISA, 29 U.S.C. §§ 1104(a)(1) to: "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries and

(A) for the *exclusive purpose* of

(i) providing benefits to participants and their beneficiaries; *and*

(ii) **defraying reasonable expenses** of administering the plan." (emphasis added).

37.    Similarly, under ERISA, fiduciaries who exercise any authority or control over plan assets or the administration of a plan must act prudently and for the exclusive benefit of participants in the plan. Fiduciaries cannot act for the benefit of themselves and must ensure that

10

the amount of fees paid from plan assets are no more than reasonable. 29 U.S.C. § 1104(a)(1)(A)(ii); *see also id*. § 1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan" and shall not inure to the benefit of the employer).

38.    Under 29 U.S.C. §§ 1104(a)(1)(B), ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets" *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 419 (2014), which requires fiduciaries to "act  with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would. . . .", 29 U.S.C. § 1104(a)(1)(B).

39.    The duties of loyalty and prudence are the "highest known to the law," *Bussian v. RJR Nabisco, Inc.,* 223 F. 3d 286, 294 (5th Cir. 2000); *see also*, *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996); *Braden v. Wal-Mart Stores, Inc*., 588 F.3d 585, 598 (8th Cir. 2009); *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006).

40.    Under the plain language of the statute, the duty of prudence imposed by 29 U.S.C. § 1104(a)(1) requires that when fiduciaries are presented with alternatives (in conduct or interpretation), the fiduciaries must choose the alternative that solely considers the interests of plan participants exclusively to fulfill the requirement to both (1) provide "benefits to participants"; *and* (2) "defray reasonable expenses of administering the plan," if an alternative that achieves both purposes is available. (emphasis added).

41.    Additionally, ERISA 29 U.S.C. § 1104 (a)(1)(D), makes explicit that the fiduciary duties set forth above exist regardless of any terms of a written plan document that may be interpreted to the contrary, stating that the provisions of all plans must be "consistent with the provisions of this subchapter and subchapter III."

42. In other words, Plan Fiduciaries are not immunized from their duties to exclusively act in the best interest of plan participants when they purport to adhere to the plan document or because the conduct at issue is not prohibited by ERISA. *Fifth Third Bancorp*, 573 U.S. at 421 (explaining that compliance with a plan document does not necessarily mean a fiduciary has discharged its duties with the prudence required under ERISA); *Bussian*, 223 F. 3d at 295 ("[S]imply because ERISA allows an employer to [take an action] does not mean that a fiduciary's acts undertaken . . . may deviate from ERISA's command that a 'fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries."); *see also* 29 U.S.C. §1110(a) ("any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility . . . for any . . . duty under this part shall be void as against public policy").

43. Finally, "a claim under ERISA may withstand a motion to dismiss based on sufficient circumstantial factual allegations to support the claim, even if it lacks direct allegations of misconduct." *See Sacerdote v. N.Y. Univ.,* 9 F.4th 95, 107 (2d Cir. 2021); *Spence,* 718 F. Supp. 3rd at 618 ("[W]hen the alleged facts do not directly address[] the process by which the Plan was managed, a claim alleging a breach of fiduciary duty may still survive a motion to dismiss if the court, based on circumstantial factual allegations, may reasonably infer from what is alleged that the process was flawed.") (cleaned up).

44. ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for, among other things, knowingly participating in a breach by another fiduciary or enables breaches by other fiduciaries.

## FACTS APPLICABLE TO ALL COUNTS

### A. The Plan[5]

45.    The Plan is a defined contribution plan pursuant to 29 U.S.C. §§ 1002(2)(A) and (34) and was created by Ochsner for the sole "benefit of its eligible employees and the eligible employees of its affiliated companies participating in the Plan."

46.    The Plan was created and funded several years prior to the class period.

47.    In accordance with 29 U.S.C. § 1103(a), the assets of the Plan are held in a trust fund "for purposes of receiving and holding in trust the assets held under the Plan." "The income and principal of the Trust Fund are for the sole use and benefit of the Participants and beneficiaries of the Plan."

48.    As an individual account, defined contribution retirement plan, the Plan "provides for an individual account for each participant and for benefits solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeiture of accounts of other participants which may be allocated to such participant's account." 29 U.S.C. § 1002(34). As such, a participants' retirement benefit in a defined contribution plan equals (1) the amount of the participants' voluntary contributions; *plus* (2) the amount of any employer contributions; *plus* (3) any investment returns on those contributions; *minus* (4) plan and investment expenses.

49.    The terms of the Plan were amended and restated effective January 1, 2015.

---

[5] Unless otherwise specified, the facts specific to the Plan in this section are taken from: (1) documents provided by Defendants to Plaintiff's counsel, including the Plan's operative governing documents during the class period; (2) Plaintiff's Plan documents; (3) the Plan's Form 5500s filed by Defendants with the Department of Labor and publicly available through the "DOL's" website at https://www.efast.dol.gov/5500Search/; and (4) other publicly available information about the Plan.

50.    As the employer and sponsor of the plan (also known as the settlor as that meaning is understood from trust law and used by the DOL in guidance), Ochsner drafted and amended the Plan and intended it "meet the requirements of [ERISA] and qualify under Sections . . . of the Internal Revenue Code of 1986, as amended."

51.    The Plan document's "Exclusive Benefit" section states that it was  "established and shall be maintained for the exclusive benefit of the Participants and their Beneficiaries. . . . [and] no part of the Trust shall revert to any Participating Employer, or be used for, or diverted to, purposes other than the exclusive benefit of the Participants and their Beneficiaries . . . ."

52.    Throughout the class period, the Plan has been funded by a combination of wage withholdings by Plan participants and Ochsner contributions ("Employer Contributions").

53.    Under the terms of the Plan Ochsner can make a determination to make an Employer Contribution for a specific plan year at any time but the Employer Contribution must be deposited into the Plan's trust fund and allocated to individual participant accounts "no later than the last date . . . for filing its federal income tax return . . . [for] such Plan Year."

54.    To the extent that Defendants determine to make an Employer Contributions, the terms of the Plan make clear that the "Employer shall have the obligation to pay the contributions" making it an obligation of Ochsner and enforceable by the Plan. [6]

55.    Upon their deposit into the Plan's trust fund, all participant contributions and Employer Contributions become assets of the Plan.

---

[6] *See*, Field Assistance Bulletin 2008-01 stating ("when an employer fails to make a required contribution to a plan in accordance with the plan documents, the plan has a claim against the employer for the contribution, and that claim is an asset of the plan."). https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2008-01

56.     Under the terms of the Plan, participants are immediately vested in their own contributions, as well as any actual earnings thereon and are vested in Ochsner matching contributions and any actual earnings on such amounts based on a six-year vesting schedule.

57.     To the extent a participant is not 100% vested upon termination of employment, the participant forfeits the unvested value of Employer Contributions and any actual earnings thereon (hereafter, "Forfeited Plan Assets") in his or her account on the earlier of the date the participant takes a lump sum distribution of all his or her vested interest in the Plan or the end of the plan year the participant incurs five consecutive one-year Breaks in Service (within the meaning of the Plan document).

58.     The Plan provides that "Expenses of the Plan and Trust, including consulting, legal expenses, and administrative expenses for such services as Account recordkeeping, required audits, governmental filings and selection of investment contracts performed by third-party service providers, may be paid directly by the Participating Employer or, at the election of the Participating Employer, such expenses may be paid from the assets of the Trust Fund." (Hereafter the "Expenses of the Plan and Trust" shall be referred to as "Administrative Expenses.")

59.     The Plan also provides that "forfeitures shall be used to reduce Participating Employer's obligations to make Matching Contributions and/or Basic Contributions and/or Retirement Contributions and/or Supplemental Retirement Contributions *and/or* to pay administrative expenses of the Plan." (emphasis added) (In a separate section the Plan also provides that Forfeited Plan Assets can be used to reinstate the accounts of rehired previously terminated eligible employees.)

60.     Additionally, under ERISA, Plan Fiduciaries always have the ability to allocate Forfeited Plan Assets to the accounts of eligible Plan participants if no other options are

available. *See* 29 U.S.C. § 1002(34) (Plan Fiduciaries have discretion to allocate "forfeitures of accounts of other participants" to eligible participants).

61.     The Plan also provides that "[i]n any event, Forfeitures arising during a Plan Year may instead be used in full or part to pay for Plan administration expenses incurred during such Plan Year or the immediately succeeding Plan Year."

62.     Throughout the class period the Plan paid direct and/or indirect compensation to third-party services providers for services to administer the Plan ranging from, among others, recordkeeping and information management, consulting, investment advisory, trustee services, loan processing, and investment management services paid indirectly by the Plan. The Plan also paid other types of fees. Hereafter the payment for services from Plan assets (director or indirectly) shall collectively be referred to as "Administrative Expenses."

63.     The third-party service providers (listed in the Plan's Form 5500), that were paid for Administrative Expenses include but are not necessarily limited to The Vanguard Group, Vanguard Advisors, and Dimeo Schneider and Associates. For example, the Plan disclosed that The Vanguard Group received $1,281,368 from Plan assets in direct compensation in 2023 as well as an undisclosed amount of indirect compensation.

64.     The Administrative Expenses of the Plan are typically paid on a quarterly basis.

**B. <u>The Plan Fiduciaries' Disloyal, Imprudent, Conflicted, and Prohibited Use of Forfeitures During the Class Period</u>**

65.     The use of Plan assets to pay Administrative Expenses to third-party service providers from the accounts of Plan participants reduces the funds available to Plan participants for distribution and/or investing and deprives the Plan and Plan participants of funds that otherwise would have been earned on the amounts deducted or paid indirectly.

16

66. Well prior to the class period, like all prudent defined contribution plan fiduciaries and plan sponsor/employers/settlors, the Defendants knew that a defined contribution "plan will not be qualified unless all funds are allocated to participants' accounts in accordance with a definite formula in the plan." IRS Field Assistance Bulletin 2008-01, page 4.

67. Similarly, all prudent defined contribution plan fiduciaries and employers knew that to ensure their plans remained qualified under the IRS Code, there were only a few allowable uses of Forfeited Plan Assets, primary among them being to defray plan expenses or reduce employer contributions. *Id.*

68. Accordingly, when designing their plan, employers had a few limited options to choose from with respect to the treatment of Forfeited Plan Assets. Employers that wanted all Forfeited Plan Assets to be used first to reduce employer contributions prior to defraying plan expenses could (and some have) drafted the terms of the plan to explicitly require that.

69. For example, during the class period, several other large plan sponsors drafted their plans to specifically require forfeited plan assets to be used to offset the Employer's matching and discretionary contributions *prior to* using Forfeited Plan Assets to defray plan expenses or to even prohibit using Forfeited Plan Assets to defray plan expenses.

70. Of course, the opposite is also true. Prior to and throughout the class period several employers drafted their plans to preclude or limit forfeited plan assets from being used to reduce employer contributions. Accordingly, just because using forfeited plan assets to reduce employer contributions is permissible under ERISA in some cases, does not make it permissible under ERISA in all cases.

71. Accordingly, employers that chose to draft their plans to provide discretion to plan fiduciaries with respect to forfeited plan assets clearly intended their plan fiduciaries to use a

prudent process to determine which of any available uses of forfeited plan assets would satisfy the terms of that particular plan.

72.    A plan fiduciary that exercises discretion to defray plan expenses is not providing a benefit greater than what was required or intended by the plan sponsor/employer (settlor). Rather, plan sponsor/employers that grant discretion to plan fiduciaries to use Forfeited Plan Assets to defray plan expenses are specifically intending to provide a benefit under the plan (*i.e.*, to use Forfeited Plan Assets to defray plan expenses) that is specifically contemplated as not only a benefit under ERISA, but also a default duty to defray plan expenses absent some prohibition in the plan document. *See* 29 U.S. Code § 1104(a)(1)(A) (noting plan fiduciaries are required to act solely for the exclusive purpose of defraying the expenses of administering the plan). As noted above, employers were always aware that they could design the plan to prevent the use of Forfeited Plan Asset to defray plan expenses.

73.    Both ERISA and the IRS Code contemplate the use of Forfeited Plan Assets to defray plan expenses as a potential benefit under a defined contribution plan. As a result, the clear intention of employers who give discretion to plan fiduciaries to defray plan expenses is to make defraying plan expenses one of the benefits provided under the terms of the Plan. '

74.    Critically, when a plan sponsor/employer makes a decision to make a discretionary contribution it is acting as a settlor and not in a fiduciary capacity with respect to the plan. In fact, a plan sponsor/employer that makes a decision to make a discretionary contribution makes that decision solely in the interest of the employer and for the exclusive purpose of benefiting the employer.

75. In contrast, a plan fiduciary making fiduciary decisions based on the discretion granted by the plan sponsor/employer is explicitly prohibited from considering the interest of the employer.

76. As set forth in detail below, there is no plausible or conceivable set of facts or circumstances here that would support a finding that, throughout the class period, a loyal and prudent Plan Fiduciary of the Ochsner Plan would have chosen to use Forfeited Plan Assets to offset Employer Contributions instead of first defraying Administrative Expenses on an ongoing basis.

77. There is no dispute that under the terms of the Plan defraying Administrative Expenses is an allowable use of Forfeited Plan Assets.

78. The terms of the Plan reflect the Plan Fiduciaries should exercise their discretion related to the use of Forfeited Plan Assets and determine that defraying Plan Administrative Expenses was more consistent with their duties under the Plan and ERISA than using Forfeited Plan Assets to offset Employer Contributions.

79. Under ERISA, and the explicit terms of the Plan, when making decisions regarding the use of Forfeited Plan Assets, the Plan Fiduciaries have been and are required by 29 U.S. Code § 1104 to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan. Similarly, under ERISA, when making decisions regarding the use of Forfeited Plan Assets, the Plan Fiduciaries have been and are required by 29 U.S.C. § 1104 (a)(1)(D) to discharge their duties "in accordance with the documents and instruments governing the plan . . . ."

19

80.    Accordingly, throughout the entire class period a prudent fiduciary would have always considered whether to use Forfeited Plan Assets to defray Administrative Expenses as opposed to using the Forfeited Plan Assets to offset Employer Contributions.

81.    In every year prior to and throughout the class period, a prudent fiduciary would conduct an evaluation of how the costs of administering the Plan would be paid. Under ERISA and the explicit provisions of the Plan, the Plan Fiduciaries were required to conduct that analysis solely in the interest of the participants and beneficiaries and for (1) the exclusive purpose of providing benefits to participants and their beneficiaries; and (2) defraying reasonable expenses of administering the Plan.

82.    In every year prior to and throughout the class period, the terms of the Plan provided that the "Expenses of the Plan and Trust" would be "paid directly by the Participating Employer [Ochsner]" unless Ochsner made an election that the "Expenses of the Plan and Trust" would be paid by the Plan.

83.    It would be in the best interests of the Plan, and its participants, for Ochsner to defray those Administrative Expenses. Accordingly, at a minimum of once a year, a prudent fiduciary would coordinate with Ochsner to determine if it would cover some or all of the Plan's Administrative Expenses. To the extent Ochsner elected to have the Plan pay some or all of the Plan's Administrative Expenses, then a prudent fiduciary would conduct an evaluation of how the Plan's Administrative Expenses would be paid. Under ERISA and the explicit provisions of the Plan, the Plan Fiduciaries were required to conduct that analysis solely in the interest of the participants and beneficiaries and for (1) the exclusive purpose of providing benefits to participants and their beneficiaries; *and* (2) defraying reasonable expenses of administering the Plan. *See* 29 U.S.C. § 1104(a)(1)(A).

20

84.     In every year prior to and throughout the class period, that analysis, when conducted prudently, would reveal that the preferential option of using Forfeited Plan Assets to defray Plan Administrative Expenses would be more consistent with the requirements of both ERISA and the Plan document.

85.     A prudent plan fiduciary would determine that using Forfeited Plan Assets to defray expenses on an ongoing basis is more consistent with discharging their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for (1) the exclusive purpose of providing benefits to participants and their beneficiaries; and (2) defraying reasonable expenses of administering the Plan because that option enables Plan participants to have more assets available for market gains for a longer period of time than allowing Forfeited Plan Assets to accrue in an unallocated plan account throughout the year to be used later (in some cases as many as 12 months later) to offset Employer contributions.[7]

86.     In fact, given that plan sponsor/employers can always terminate or amend their plan at any time or decide to reduce or eliminate a discretionary contribution, all else being equal, a plan participant is *always* mathematically better off to have plan expenses defrayed on an ongoing basis as opposed to waiting for an unguaranteed benefit at some point in the future that may or may not exceed the amount of the plan expenses.

87.     Even if that were not the case (which it is), as described in detail below, there are no known facts or circumstances that would support a finding that failing to use Forfeited Plan Assets to defray Administrative Expenses was more consistent with the Plan Fiduciaries' duty to discharge

---

[7] It is worth noting that a fundamental premise of the retirement plan industry well prior to and throughout the class period is that, under modern portfolio theory (which is incorporated into ERISA under the prudent investor standard), markets will go up over time. Therefore, as noted above, the DOL has made clear that all else being equal plan participants are better off investing in the market sooner rather than later.

their duties solely in the interest of the participants. Any assertions to that effect are purely speculative.

88.     Accordingly, in each year throughout the class period, a prudent and loyal Plan fiduciary, having made the determination that using Forfeited Plan Assets to defray expenses on an ongoing basis is more consistent with discharging their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for (1) the exclusive purpose of providing benefits to participants and their beneficiaries; and (2) defraying reasonable expenses of administering the Plan, would have then informed Ochsner that Forfeited Plan Assets would be used first to defray Administrative Expenses prior to their being used to reduce employer contributions.

89.     In every year throughout the class period the amount of Forfeited Plan Assets that the Plan Fiduciaries used to offset Ochsner's declared Employer Contributions exceeded the amount of direct compensation paid from the accounts of Plan participants to pay the Plan's Administrative Expenses.

90.     Accordingly, in every year immediately prior to and throughout the class period, at least once a year, at the time the Ochsner would be prepared to make its Employer Contributions, a prudent Plan fiduciary would have coordinated with the Plan's recordkeeper to determine how much, if any, of the Forfeited Plan Assets would be available to reduce Employer Contributions after consideration of the use of Forfeited Plan Assets to defray plan expenses on an ongoing basis.

91.     Having conducted this prudent analysis in every year immediately prior to and throughout the class period, the Plan Fiduciaries should have required Ochsner to contribute the

full amount of both its required Matching Employer Contributions as well as its declared discretionary Employer Contributions.[8]

92.     After having conducted this prudent analysis, the Plan Fiduciaries would have been obligated to ensure that Ochsner remitted contributions to the Trust and had a duty and responsibility for the collection of such contributions.

93.     In fact, however, the Plan Fiduciaries imprudently and disloyally coordinated with Ochsner in a way that did not enable the Forfeited Plan Assets to be used to defray Plan Administrative Expenses.

94.     In other words, the Plan Fiduciaries improperly, imprudently, and disloyally coordinated with the Ochsner and the Plan's recordkeeper to calculate how much of the Forfeited Plan Assets would be used to reduce Ochsner Contributions and provided that direction to the Plan's recordkeeper.

95.     It is reasonable to infer that the Plan Fiduciaries imprudently engaged in this conduct due to their conflict of interest based on their desire to defray amounts owed to the Plan by Ochsner. The only reasonable explanation and inference to be drawn from the conduct of the Fiduciaries is that they discharged their duties considering the best interests of Ochsner as opposed to solely in the interest of the participants and beneficiaries and for (1) the exclusive purpose of providing benefits to participants and their beneficiaries; and (2) defraying reasonable expenses of administering the Plan.

---

[8] Except to the extent that the Forfeited Plan Assets exceeded the foreseeable future ongoing Administrative Expenses of the Plan as evaluated *solely* in the interest of Plan participants and for the exclusive purpose of providing benefits to participants *and* defraying the Administrative Expenses of the Plan. Defendants are solely in the possession of the documents that would be necessary to review and evaluate in order to make that determination.

96.　In every year prior to and throughout the class period, there are no known facts or circumstances that would support a decision by independent and unconflicted Plan Fiduciaries to fail to use Forfeited Plan Assets to defray plan expenses on an ongoing basis. Rather, the only plausible inference to be drawn based on the conduct of the Defendants is that Defendants made the decision to use Forfeited Plan Assets to offset Ochsner Employer Contributions was made solely in the interest of Ochsner.

97.　In every year prior to and throughout the class period, there are no facts or circumstances that are publicly available or have been provided by Defendants that would support a finding that failing to use Forfeited Plan Assets to defray Plan expenses was more consistent with the Plan Fiduciaries' duty to discharge their duties solely in the interest of the participants and beneficiaries and for (1) the exclusive purpose of providing benefits to participants and their beneficiaries; and (2) defraying reasonable expenses of administering the Plan.

98.　The facts and circumstances alleged herein are　consistent with the Plan Fiduciaries trying to increase Ochsner's profit, despite their fiduciary duties to act solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan.

99.　In fact, every year throughout the class period, Ochsner's decisions related to Employer Contributions were and are largely made without reference to the amount of Forfeited Plan Assets. Rather, under the circumstances prevailing prior to and throughout the class period, the criteria used by Boards of Directors or their delegees to determine company contributions to retirement plans are driven largely by the profitability and the HR strategy (to attract and retain talented employees) of the company.

100. In other words, as is the case of the Plan, the amount of a company's contribution is typically decided as a percent of the compensation of eligible employees or determined through a matching formula. In fact, the amount of Forfeited Plan Assets that are typically available to defray plan expenses or offset employer contributions are immaterial in the context of the total amount of money a company elects to contribute.

101. For example, from 2019 through 2023, the ~$11.6M of Forfeited Plan Assets used to disloyally and imprudently offset Employer Contributions made up less than 5% of the ~$243.9M of Employer Contributions declared by Ochsner.

102. In fact, it is only after Ochsner contribution levels (settlor decisions on funding) are made and/or declared, that the Plan Fiduciaries are even in a position to determine whether or not to use Forfeited Plan Assets to offset the total amount of Ochsner Employer Contributions that had already been approved by Ochsner.

103. The Plan Fiduciaries are only even able to consider using Forfeited Plan Assets to offset discretionary Employer Contributions after Ochsner's Board of Directors (or other executives or delegees) determine their Employer Contribution percentage rate. If in any given year Ochsner did not decide to make an Employer Contribution, then the Plan Fiduciaries would be forced to use all the Forfeited Plan Assets that had built up throughout the prior year to defray whatever portion of the Administrative Expenses of the Plan that could be defrayed at that point. In all likelihood, the Forfeited Plan Assets available to the Plan Fiduciaries at that point in time would greatly exceed the amount of Administrative Expenses that could be offset prior to the deadline imposed by the terms of the Plan. In that case the Plan Fiduciaries would likely have to allocate the Forfeited Plan Assets back to Plan participants to keep the Plan Qualified because that would be the only other

option under the terms of the Plan and ERISA. *See, e.g*., 29 U.S.C. § 1002(34). See also, e.g., IRS Field Assistance Bulletin 2008-01, page 4.

104. Under the circumstances prevailing prior to and throughout the class period and as applicable to the Plan, it is absurd speculation to assert that a Plan Fiduciary's decision to loyally and prudently use discretion to defray plan expenses would have any impact on Ochsner's decision to make an Employer Contribution.

105. Under the terms of the Plan and ERISA, at the discretion of Defendants, Forfeited Plan Assets may be used to pay the Plan's expenses, reduce Ochsner's contributions to the Plan, reinstate the accounts of rehired participants, or allocate Forfeited Plan Assets to the accounts of eligible Plan participants.

106. Which of these options would be in the best interests of participants depends on the particular facts and circumstances present at the time of the allocation decision, and requires a careful and prudent analysis on the part of the Plan Fiduciaries.

107. Under ERISA, when making decisions regarding the use of Forfeited Plan Assets, the Plan Fiduciaries have been and are required by 29 U.S. Code § 1104 to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries, **and for the "exclusive purposes of providing benefits to participants in the plan** and their beneficiaries **and defraying reasonable expenses** of administering the plan." 29 U.S.C. § 1103(c)(1) (emph. added).

108. Consequently, throughout the class period, an objective analysis of the available options throughout the class period, guided solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants ***and*** defraying reasonable expenses of administering the Plan would indisputably not result in Plan Fiduciaries choosing to

use most or all Forfeited Plan Assets available to reduce future Employer Contributions throughout the class period instead of using Forfeited Plan Assets to defray Administrative Expenses.

109.    Instead of acting solely in the interest of Plan participants by using Forfeited Plan Assets to defray the Plan's Administrative Expenses charged to the individual accounts of Plan participants on an ongoing basis (or allocating the Forfeited Plan Assets to the accounts of eligible Plan participants if there was no other option available), Defendants chose to use most or all the Forfeited Plan Assets for the exclusive purpose of reducing Ochsner's Employer Contributions to the Plan, thereby saving the Company millions of dollars at the expense of the Plan.

110.    Moreover, the Plan Fiduciaries engaged in a process that maximized the amount of time Forfeited Plan Assets were held in an unallocated account thereby preventing Plan participants from the opportunity to participate in the potential for market gains.

111.    On its face, all else being equal, under the specific facts and circumstances existing immediately prior to and throughout the class period, no independent and objective plan fiduciary not subject to a conflict of interest based on a relationship with a party in interest, *i.e.*, Ochsner, and acting *solely* in the interest of Plan participants and for the *exclusive* purpose of proving benefits *and* defraying expenses, would ever choose to offset Ochsner's obligation to make Employer Contributions with Forfeited Plan Assets when the Plan Fiduciary could instead use the Forfeited Plan Assets to defray Administrative Expenses of the Plan on an ongoing basis.

112.    During the class period, the terms of the Plan obligated Ochsner to make contributions to the Plan in the following amounts: (1) in 2019, at least $37,832,175; (2) in 2020, at least $38,192,584; (3) in 2021, at least $48,781,065; (4) in 2022, at least $57,387,660; and (5) in 2023, at least $61,693,401.

113.    During the class period, the discretion granted to the Plan Fiduciaries required the Plan Fiduciaries to use Forfeited Plan Assets to defray Administrative Expenses. Instead, the Plan Fiduciaries allowed Ochsner to offset its obligation to make Employer Contributions by allocating Forfeited Plan Assets in the following amounts: (1) in 2019, $1,843,926; (2) in 2020, $1,597,179; (3) in 2021, $2,400,764; (4) in 2022, $2,595,597; and (5) in 2023, $3,120,050. These actions saved Ochsner the respective amounts, which flowed directly to its bottom-line profit.

114.    During the class period, the Plan Fiduciaries were required under the terms of the Plan and ERISA to direct the use of Forfeited Plan Assets to defray Administrative Expenses in the following minimum amounts: (1) in 2019, approximately $1,167,313; (2) in 2020, approximately $1,315,673; (3) in 2021, approximately $1,658,137; (4) in 2022, $1,966,821; and (5) in 2023, $2,445,653.

115.    During the class period, the Plan Fiduciaries caused Plan Participants to pay Plan Administrative Expenses through deductions from their accounts and indirectly through revenue sharing or similar methods. The minimum direct amounts paid by participants were: 1) in 2019, approximately $1,167,313; (2) in 2020, approximately $1,315,673; (3) in 2021, approximately $1,658,137; (4) in 2022, $1,966,821; and (5) in 2023, $2,445,653.[9]

116.    As of December 31 of each year in the class period, unallocated Forfeited Plan Assets remained unused in the following amounts: (1) in 2019, $628,874; (2) in 2020, $280,647; (3) in 2021, $966,883; (4) in 2022, $1,340,717; and (5) in 2023, $1,345,744.

117.    Throughout the class period, the Plan Fiduciaries did not use any Forfeited Plan Assets to reduce Plan Administrative Expenses.

_____

[9] The amount of Plan Administrative Expenses specifically identified in this Complaint likely understates the actual Plan Administrative Expenses paid by Plan participants because the amounts do not include undisclosed indirect compensation paid by Plan participants.

118.    The following chart summarizes the Plan Fiduciaries' use of Forfeited Plan Assets throughout the class period.[10]

| YEAR | FORFEITURES USED BY OCHSNER TO OFFSET OCHSNER CONTRIBUTIONS | FORFEITURES DISCLOSED USED FOR PLAN ADMIN EXPENSES | THIRD PARTY EXPENSES PAID BY THE PLAN OR PARTICIPANTS | FORFEITURE BALANCE AT YEAR END LEFT IN AN UNALLOCATED ACCOUNT |
|---|---|---|---|---|
| 2019 | $1,843,926 | $0 | $1,167,313 | $628,874 |
| 2020 | $1,597,179 | $0 | $1,315,673 | $280,647 |
| 2021 | $2,400,764 | $0 | $1,658,137 | $966,883 |
| 2022 | $2,595,597 | $0 | $1,966,821 | $1,340,717 |
| 2023 | $3,120,050 | $0 | $2,445,653 | $1,345,744 |
| 2024 | $2,765,083 | $0 | $2,994,493 | $167,320 |
| **Total** | **$14,322,599** | **$0** | **$11,548,090** | **$4,730,185** |

119.    Under the terms of the Plan and the provisions of ERISA, throughout the class period the Plan Fiduciaries exercised discretion over, and control of, Plan assets when directing the use of Forfeited Plan Assets.

120.    Under the terms of the Plan and the provisions of ERISA, throughout the class period the Plan Fiduciaries were required to determine, with respect to Forfeited Plan Assets, which of several alternatives would be in the best interest of the participants.

121.    As described in detail above, throughout the class period, the Plan Fiduciaries' decisions to use Forfeited Plan Assets to reduce employer contributions was, all else being equal, in the best interest of Ochsner because that option decreased Ochsner's own contribution costs.

122.    As described in detail above, throughout the class period, the Plan Fiduciaries exercised discretion over, and control of, Plan assets when directing the use of Plan assets by causing transactions to pay Administrative Expenses to Vanguard and other third party providers from the accounts of Plan participants.

---

[10] Within the last week Ochsner filed the Plan's Form 5500 for 2024.  Accordingly, the chart also includes the recently disclosed information for 2024.

123. As described in detail above, throughout the class period, the Plan Fiduciaries exercised discretion over, and control of, Plan assets when failing to use Forfeited Plan Assets to defray indirect compensation paid to Vanguard for Administrative Expenses.

124. There are no facts or circumstances throughout the class period that make discretionary decisions to use Forfeited Plan Assets to reduce Ochsner contributions consistent with discharging their duties with respect to the Plan solely in the interest of the participants and beneficiaries **and for the exclusive purpose of providing benefits to participants** and their beneficiaries **and defraying reasonable expenses** of administering the Plan.

125. For each year of the putative class period, Ochsner had sufficient cash and equivalents on hand to satisfy its contribution obligations to the Plan. Nevertheless, throughout that period, Defendants consistently based the decision of how to allocate Forfeited Plan Assets solely on Ochsner's own self-interests and failed to consider the interests of the Plan and its participants.

126. As described in detail above, throughout the class period, the Plan Fiduciaries exercised discretion over, and control of, Plan assets and consistently and reflexively chose to use the Forfeited Plan Assets for their own exclusive interest, to the detriment of the Plan and participants, by allocating Forfeited Plan Assets toward reducing Ochsner's contributions to the Plan while enabling Ochsner to maintain its discretionary contributions as an employee benefit.

127. While Defendants benefited, the Plan and its participants and beneficiaries suffered. If Defendants decided throughout the class period to use Forfeited Plan Assets to defray the reasonable expenses of administering the Plan or allocated the Forfeited Plan Assets back to eligible participants, the value of the Plan and the value of the participant's individual accounts would have been greater thereby providing greater retirement benefits to Plan participants and beneficiaries.

128.     Had the Plan Fiduciaries exercised discretion over the Forfeited Plan Assets loyally and prudently and solely in the interest of the participants and beneficiaries, the Plan Fiduciaries would have chosen to use Forfeited Plan Assets to defray the Administrative Expenses of the Plan.

129.     Instead, the Plan Fiduciaries have consistently chosen to utilize the Forfeited Plan Assets to benefit Ochsner to the detriment of Plan participants by reducing Defendants' contractually obligated Employer Contributions to the Plan and causing transaction that resulted in money being extracted from the accounts of Plan participants to pay the Plan's Administrative Expenses.

130.     To be clear, Plaintiffs do not allege that ERISA prohibits fiduciaries from *ever* using forfeitures to offset employer contributions. Rather, Plaintiffs allege that under the specific facts and context of this Plan, a loyal and prudent fiduciary would not make the decisions that the Plan Fiduciaries made (as alleged above). Here, under the circumstances described, Defendants have breached their fiduciary duties, ERISA's prohibited transaction rules, and the Plan's own terms. *See e.g., Sacerdote v. N.Y. Univ.,* 9 F.4th 95, 108-09 (2d Cir. 2021) ("[We] caution against overreliance on . . . other ERISA cases as benchmarks. While such comparisons may sometimes be instructive, their utility is limited because the assessment of any particular complaint is a context-specific task. We cannot rule out the possibility that a fiduciary has acted imprudently by including a particular fund even if, for example, the fees that fund charged are lower than a fee found not imprudent in another case.").

131.     In summary, the totality of the specific facts and circumstances of the Plan and the conduct of the Plan Fiduciaries throughout the class period demonstrates that Defendants failed to administer the Plan in a prudent and loyal manner.

31

132. Further, as described in detail above, throughout the class period, the Plan Fiduciaries exercised discretion over, and control of, Plan Assets when directing the use of Participants' accounts to cause transactions to pay Administrative Expenses to third-party service providers.

133. Throughout the class period the Plan Fiduciaries caused the Plan to engage in thousands of transactions that used plan assets to constitute a furnishing of services between the plan and a party in interest. At the same time, through these thousands of transactions paying Administrative Expenses from the accounts of Plan participants to third-party service providers, the Plan Fiduciaries also caused the Plan to engage in transactions that constitute a direct or indirect use of Forfeited Plan Assets for the benefit of a party in interest (*i.e.*, Ochsner).

134. Likewise, after the Plan Fiduciaries improperly exercised discretion and control over Plan asset by causing transactions that resulted in the payment of Administrative Expenses from the accounts of Plan participants, the Plan Fiduciaries then caused the Plan to engage in several transactions with a Party in interest (*i.e.*, Ochsner), that for the benefit of Ochsner, allowed Ochsner to use Forfeited Plan Assets to offset and reduce the amount of Ochsner's Employer Contributions (Plan assets) transferred to the Plan.

135. The facts and circumstances here are more consistent with the Plan Fiduciaries trying to increase Ochsner's profit, despite their fiduciary duties to act *solely* in the interest of the participants and beneficiaries **and for the *exclusive* purpose of providing benefits to participants** and their beneficiaries ***and* defraying reasonable expenses** of administering the Plan.

136. While Defendants benefited, the Plan and its participants and beneficiaries suffered. If Defendants decided throughout the class period to use Forfeited Plan Assets to defray

the reasonable expenses of administering the Plan, the value of the Plan and the value of the participants' individual accounts would have been greater. Not because the Plan Participants would receive an additional benefit but because they would receive the full benefit they were entitled to as a defined contribution plan participant under the Plan (as drafted and designed) and ERISA.

### TRANSACTIONS PROHIBITED BY ERISA

137.    In addition to ERISA's fiduciary duties, Congress enacted even more stringent additional safeguards to avoid transactions that are highly susceptible to abuse by ERISA fiduciaries. Specifically, ERISA "Section 1106 supplements [a] fiduciary's general duty of loyalty to the plan's beneficiaries . . . by categorically barring certain transactions deemed 'likely to injure the pension plan." *Cunningham,* 604 U.S. at 697.

138.    ERISA Section 406(a), 29 U.S.C. § 1106(a)(1), prohibits transactions that benefit a party in interest. 29 U.S. Code § 1106(a)(1)(A)-(E).

139.    ERISA Section 406(b), 29 U.S.C. § 1106(b) prohibits a fiduciary of the plan from dealing with the assets of the plan in any way that benefits the fiduciary or is adverse to the plan participants' interest.  29 U.S. Code § 1106(b)(1)-(3).

140.    Section [1106](b) prohibits a plan fiduciary from engaging in various forms of self-dealing. Its purpose is to 'prevent[] a fiduciary from being put in a position where he has dual loyalties and, therefore, he cannot act exclusively for the benefit of a plan's participants and beneficiaries.'" *Reich v. Compton*, 57 F.3d 270, 287 (3d Cir. 1995) (Alito, J.), quoting H.R. Rep. No. 93-1280 (1974)).

141.    According to the United States Department of Labor (the "DOL"), ERISA's Section 406(b)'s

[P]rohibitions are imposed upon fiduciaries to deter them from exercising the authority, control, or responsibility which makes such persons fiduciaries when they have interests

33

which may conflict with the interests of the plans for which they act. In such cases, the fiduciaries have interests in the transactions which may affect the exercise of their best judgment as fiduciaries.

29 C.F.R. § 2550.408b-2(e)(1).

142.    ERISA Section 3(14) defines a party in interest to include the Plan employer (in this case Ochsner), a Plan fiduciary (in this case Ochsner and the Committee), and the Plan's third-party administrators (as listed in the Plan's Forms 5500 and described above).

143.    Under ERISA, anyone who exercises discretion or control over plan assets, including the Plan sponsor (Ochsner) and Committee, is a fiduciary. 29 U.S.C. § 1002(21)(A).

144.    The Supreme Court instructs that "[a]t the pleading stage, [] it suffices for a plaintiff plausible to allege the three elements" of a prohibited transaction claim "no more, no less." *Cunningham*, 604 U.S. at 709.

**DEFENDANTS ENGAGED IN SELF-DEALING AND CAUSED MANY PROHIBITED TRANSACTIONS IN VIOLATION OF ERISA**

146.  Throughout the class period, the Plan Fiduciaries directed and authorized tens of thousands of transactions extracting money from the accounts of Plan participants to pay over $8 million for Plan Administrative Expenses to the Plan's third-party service providers that should have been defrayed fully or in part by Forfeited Plan Assets.

147.    These transactions are memorialized in the statements received by each Plan participant and are also memorialized in Plan level accounting, *e.g.*, a trust report of the Plan.

148.    Moreover, throughout at least a portion of the class period, Defendants directed and authorized Plan participants to pay an indeterminable amount of indirect compensation for Plan Administrative Expenses which could have also been defrayed by Forfeited Plan Assets.

149.    Had the Defendants acted in accordance with the terms of the Plan document and ERISA the Defendants should have directed the use of Forfeited Plan Assets to defray the Plan Administrative Expenses that Defendants instead required Plan participants to pay through transactions from their individual accounts or through indirect compensation.

150.    Throughout the class period, Defendants also caused the Plan to engage in at least six transactions with Ochsner, a party in interest, related to Ochsner's contractual, once declared, to make Employer Contributions to the Plan. For each of these transactions, the Plan Fiduciaries coordinated with the third-party recordkeeper and Ochsner to calculate how much Ochsner could reduce its obligatory Employer Contribution payment to the Plan by offsetting the full amount owed with the use of Forfeited Plan Assets.

151.    In each of these instances, Defendants caused the Plan to engage in a transaction with Ochsner that directly resulted in a smaller amount of money being paid by Ochsner into the Plan.

152.    In other words, at least six times each year the Plan Fiduciaries engaged in calculations for the express purpose of calculating how much money Ochsner could save from its contractual obligation to the Plan by using Forfeited Plan Assets to offset the amount of Ochsner's contribution.

153.    As noted above, each of these transactions is also memorialized in Plan trust reports. Each of these transactions then serves to provide the assets necessary to execute thousands of transactions to invest Ochsner contributions and Forfeited Plan Assets pursuant to the investment instructions of Plan participants.

154.    Each of these transactions involves the receipt of Ochsner contributions and calculations related to Forfeited Plan Assets to enable a combination of Forfeited Plan Assets and

Ochsner contributions to be combined for use in following the investment instructions of thousands of Plan participants.

155.   As part of the same conduct, at least six times a year Defendants caused the Plan to engage in transactions that both directly and indirectly provided a benefit to a party in interest, *i.e.,* Ochsner, in the amount of Forfeited Plan Assets used to reduce Ochsner's contractual obligation to the Plan.

156.   Throughout the class period the Plan Fiduciaries engaged in the conduct of making calculations that caused the Plan to receive at least $14,000,000 less in Ochsner contributions than what Ochsner was obligated to make and which increased Company profits by at least $14.3 million.

157.   Additionally, the Defendants caused the Plan to engage in these transactions with Ochsner that constituted and resulted in the use of Forfeited Plan Assets for the direct and indirect benefit of Ochsner, a party in interest and Plan Fiduciary.

158.   Throughout the class period, by directing, authorizing, and causing at least six transactions with Ochsner and tens of thousands of transactions with Plan participants, Defendants dealt with the Forfeited Plan Assets in their own individual interest and in Ochsner's interest by using Forfeited Plan Assets to offset Ochsner's contractual obligations to the Plan.

159.   Throughout the class period, by directing, authorizing, and causing over six transactions with Ochsner and tens of thousands of transactions with Plan participants, the individual Plan Fiduciaries acted in their individual capacity and as agents of a party in interest, *i.e.*, Ochsner, whose interests are adverse to the Plan or Plan Participants.

160.   Throughout the class period, by directing, authorizing, and causing over six transactions with Ochsner and tens of thousands of transactions with Plan Participants, the

individual Plan Fiduciaries received consideration for their own personal accounts from Ochsner as a result of their control over the transactions described above with a party in interest, *i.e.*, Ochsner, involving the Forfeited Plan Assets, that enabled Ochsner to reduce its costs and increase its profits thereby benefiting each individual Plan Fiduciary.

<b><u>CLASS ACTION ALLEGATIONS</u></b>

161.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

162.    In acting in their representative capacity for the Plan, Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representative of, the following class:

> All participants and beneficiaries of the Ochsner Clinic Foundation 401(k) Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning March 14, 2019, and running through the date of judgment.

163.    The class includes over 20,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

164.    There are questions of law and fact common to this class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Thus, common questions of law and fact include but are not limited to the following:

> a.    Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);
>
> b.    Whether Defendants breached their fiduciary duties to the Plan with respect to their management and allocation of Forfeited Plan Assets;

37

     c.     Whether Plan Fiduciaries engaged in prohibited transactions with Forfeited Plan Assets;

     d.     What are the losses to the Plan resulting from each alleged breach of ERISA; and

     e.     What Plan-wide equitable and other relief the Court should impose to remedy Defendants' alleged breaches.

165. Plaintiffs' claims are typical of the claims of the class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiffs were participants during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct.

166. Plaintiffs will adequately represent the class pursuant to Federal Rule of Civil Procedure 23(a)(4), because they were participants in the Plan during the class period, have no interest that conflicts with the class, are committed to the vigorous representation of the class, and have engaged experienced and competent lawyers to represent the class.

167. Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a); and adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

168. Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the class, such

that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

169.    Plaintiffs' attorneys have substantial and varied experience in complex ERISA and class action litigation and will adequately represent the class.

## COUNT I
### Breach of ERISA's Fiduciary Duty of Loyalty
### (29 U.S.C 1104(a)(1)(A))

170.    Plaintiffs reallege and incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

171.    When exercising discretion and control over Forfeited Plan Assets and using them to reduce Ochsner contributions, instead of defraying the reasonable costs of administering the Plan or allocating the Forfeited Plan Assets back to eligible Plan participants, the Plan Fiduciaries considered the best interest of Ochsner as opposed to participants, in violation of ERISA.

172.    Alternatively, when exercising discretion and control over Forfeited Plan Assets and failing to use them to defray the reasonable costs of administering the Plan, the Plan Fiduciaries considered the best interests of Ochsner, as opposed to participants, in violation of ERISA.

173.    When exercising control over Forfeited Plan Assets, the Plan Fiduciaries failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, when those aims are to act *solely* in the interest of the Plan participants and beneficiaries **and for the exclusive purpose of providing benefits to Plan participants** and their beneficiaries **and defraying reasonable expenses** of administering the Plan in violation of ERISA.

39

174.    As a direct and proximate result of Defendants' fiduciary breaches described herein, the Plan and class suffered injury and loss for which Defendants are personally liable and are subject to appropriate equitable relief, pursuant to 29 U.S.C. § 1109, including, without limitation, the disgorgement of all ill-gotten profits to Defendants resulting from the breach of their duty of loyalty.

175.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

176.    Plaintiffs have suffered losses as a direct result of Defendants' breach of their duty of loyalty.

## COUNT II
### Breach of ERISA's Fiduciary Duty of Prudence
### (29 U.S.C. 1104(a)(1)(B))

177.    Plaintiffs reallege and incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

178.    When exercising discretion and control over Forfeited Plan Assets and using them to reduce Ochsner contributions, the Plan Fiduciaries failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, when those aims are to act *solely* in the interest of the Plan participants and beneficiaries and for the *exclusive purpose of providing benefits* to Plan participants and their

40

beneficiaries *and defraying reasonable expenses* of administering the Plan, in violation of ERISA.

179.    When deciding how to allocate Forfeited Plan Assets, Defendants utilized an imprudent and flawed process. Despite the conflict of interest presented by alternatives under both ERISA and the Plan document, Defendants failed to undertake any reasoned and impartial decision-making process to determine whether using the Forfeited Plan Assets to reduce the Ochsner's own contribution expenses, as opposed paying Plan Administrative Expenses or for other purposes allowable under ERISA, was in the best interest of the Plan's participants or was prudent, and failed to *solely* consider which alternative would promote the **exclusive purpose of providing benefits to Plan participants** and their beneficiaries **and defraying reasonable expenses** of administering the Plan, in violation of ERISA.

180.    By refusing to use Forfeited Plan Assets to defray Plan Administrative Expenses that were instead charged to participant accounts, and instead deciding to use these Plan assets to reduce the Ochsner's own contribution expenses, Defendants imprudently caused the value of the Plan's assets to decrease by causing Plan participants to incur expense deductions from their individual accounts that would otherwise have been defrayed in whole or in part by utilizing the Forfeited Plan Assets to pay Plan Administrative Expenses.

181.    Had the Plan Fiduciaries conformed with the minimum standard of care required under ERISA, the Plan Fiduciaries would not have used Forfeited Plan Assets to exclusive reduce Ochsner's contribution obligation.

182.    Additionally, by allowing millions of dollars of Forfeited Plan Assets to sit in an unallocated plan account at the end of each year instead of using those amounts to defray Administrative Expenses, Defendants imprudently caused the value of the Plan's assets to decrease

by causing Plan Participants to incur expense deductions from their individual accounts that would otherwise have been defrayed in whole or in part by utilizing the Forfeited Plan Assets to pay Administrative Expenses.

183. Alternatively, had the Plan fiduciaries conformed with the minimum standard of care required under ERISA, they would have used Forfeited Plan Assets to defray reasonable expenses of administering the Plan.

184. Plaintiffs and the class have suffered losses as a direct result of the Defendants' breach of their duty of prudence.

185. Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of its fiduciary duties alleged in this Count. Each Defendant is also subject to other equitable or remedial relief as appropriate.

186. Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT III
### Fiduciary Prohibited Transactions/ Self-Dealing
### (29 U.S.C. 1106(b)(1))

187. Plaintiffs reallege and incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

188. 29 U.S.C. § 1106(b) provides that "[a] fiduciary with respect to a plan shall not (1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or

in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

189.    Defendants were and continue to be Plan Fiduciaries. In their management and control of Forfeited Plan Assets, Defendants caused the Plan to use Plan assets (Forfeited Plan Assets) to fund Ochsner's contractual obligation to make employer matching contributions to the Plan. By allocating these Plan assets toward offsetting Ochsner's contribution obligations, Defendants saved Ochsner millions of dollars in employer matching contribution expenses. Defendants therefore dealt with the assets of the Plan in their own interest or for Ochsner's own account, in violation of 29 U.S.C. § 1106(b)(1).

190.    Additionally, Defendants in their individual capacity or as an agent of Defendant Ochsner acted in a transaction involving the Plan on behalf of a party (Defendant Ochsner) whose interests are adverse to the interests of the Plan and the interests of Plan participants and their beneficiaries in violation of  29 U.S.C. § 1106(b)(2) and received consideration for their own personal accounts from parties dealing with the Plan in connection with transactions involving the assets of the Plan (Forfeited Plan Assets) in violation of 29 U.S.C. § 1106(b)(3).

191.    As a result of this prohibited conduct, Defendants caused the Plan and Plan Participants and class to suffer losses in the amount of the Plan assets that were substituted for employer matching contributions and lost earnings on those assets.

192.    Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the prohibited conduct alleged in this claim, to restore

to the Plan all assets and profits obtained through the use of Plan assets and is subject to other equitable or remedial relief as appropriate.

## COUNT IV
### Fiduciary Prohibited Transactions/ Party in Interest
### (29 U.S.C. 1106(a)(1))

193.   Plaintiffs reallege and incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

194.   29 U.S.C. § 1106(a)(1) provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect. . . exchange. . . of any property between the plan and a party in interest . . . or use by or for the benefit of a party in interest, of any assets of the plan."

195.   Defendants are parties in interest, as that term is defined under 29 U.S.C. § 1002 (14), because they are Plan Fiduciaries and because Ochsner is the employer of Plan participants.

196.   The Plan's third-party administrators and other service providers are also parties in interest. *See Cunningham*, 604 U.S. at 697 ("[ERISA], in turn defines a "party in interest"" to include various plan insiders, including the plan's administrator, sponsor, and its officers, as well as entities providing services to [the] plan.") (internal citations omitted).

197.   When Defendants elected to cause Plan participants to engage in transactions extracting Administrative Expenses from their accounts to enable Ochsner to use Forfeited Plan Assets as a substitute for future Employer Contributions to the Plan, thereby saving Ochsner millions of dollars in contribution expenses, Defendants caused the Plan to engage in transactions that constituted a direct or indirect exchange of existing Plan assets for future employer contributions and/or use of Plan assets by or for the benefit of a party in interest.

198.    Additionally, when Defendants elected to use Forfeited Plan Assets as a substitute for declared Employer Matching Contributions to the Plan and not for Administrative Expenses, Defendants caused the Plan to engage in prohibited transactions with the Plan's third-party administrator and other service providers for the payment of Administrative Expenses from Plaintiffs and all Plan Participants' individual accounts that were sent to the Plan's third-party administrators and other third party service providers and that should have been paid in part or full by the Forfeited Plan Assets.

199.    As a result of these prohibited transactions, Defendants caused the Plan to suffer losses in the amount of the Forfeited Plan Assets that were substituted for employer matching contributions and lost investment returns on those assets.

200.    Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the prohibited conduct alleged in this claim, to restore to the Plan all assets and profits obtained through the use of Plan assets and is subject to other equitable or remedial relief as appropriate.

## COUNT V
### Failure to Adequately Monitor Other Fiduciaries

201.    Plaintiffs restate the above allegations as if fully set forth herein.

202.    Defendant Ochsner had the authority to appoint and remove members or individuals responsible for Forfeited Plan Assets on the Committee and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

203.    In light of this authority, Defendant Ochsner had a duty to monitor those individuals responsible for Forfeited Plan Assets on the Committee to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

204.    Defendant Ochsner had a duty to ensure that the individuals responsible for Forfeited Plan Assets possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Forfeited Plan Assets; and reported regularly to Ochsner.

205.    The objectively disloyal, imprudent, and conflicted manner in which the Committee of the Plan handled Forfeited Plan Assets inferentially establish that Defendant Ochsner breached its duty to monitor by, among other things:

   a.    Failing to monitor and evaluate the performance of individuals responsible for Forfeited Plan Assets on the Committee of the Plan or have a system in place for doing so, standing idly by as the Plan misallocated Forfeited Plan Assets for Ochsner's benefit;

   b.    Failing to monitor the process by which the Committee of the Plan was evaluated and failing to investigate the proper use of Forfeited Plan Assets; and

   c.    Failing to remove individuals responsible for Forfeited Plan Assets on the Committee of the Plan whose performance was inadequate in that these individuals continued to misallocate Forfeited Plan Assets for the benefit of Ochsner.

206.    As the consequences of the breaches of the duty to monitor related to the use of Forfeited Plan Assets, the Plaintiffs and participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

207.    Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendant Ochsner is liable to restore to the Plan all losses caused by its failure to adequately monitor individuals responsible for Forfeited Plan Assets on the Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**PRAYER FOR RELIEF**

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated participants and beneficiaries, respectfully request that the Court:

- find and declare that Defendants have breached their fiduciary duties and engaged in prohibited conduct and transactions as described above;

- find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each violation of ERISA described above, and to otherwise restore the Plan to the position it would have occupied but for these violations;

- order the disgorgement of all assets and profits secured by Defendants as a result of each violation of ERISA described above;

- determine the method by which Plan losses under 29 U.S.C. §1109 should be calculated;

- order Defendants to provide all accounting necessary to determine the amounts Defendants must make good to the Plan under 29 U.S.C. § 1109(a);

- remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- certify the class, appoint Plaintiffs as class representatives, and appoint the Chirinos Law Firm PLLC and Stiegler Law Firm LLC as class counsel;

- award to Plaintiffs and the class their attorneys' fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

- order the payment of interest to the extent it is allowed by law; and

- grant other equitable or remedial relief as the Court deems appropriate.

October 21, 2025                    Respectfully submitted,

**STIEGLER LAW FIRM LLC**

*/s/Charles J. Stiegler*
Charles Joseph Stiegler
La. Bar Roll No. 33456
318 Harrison Ave., Ste 104
New Orleans, LA 70124-3126
Phone: 504-267-0777 | Fax: 504-513-3084
Email: charles@stieglerlawfirm.com


**CHIRINOS LAW FIRM PLLC**
Tulio D. Chirinos (TA)
La. Bar Roll No. 35079
370 Camino Gardens Blvd., Ste 106
Boca Raton, FL 33432
Telephone: (561) 299-6334
tchirinos@chirinoslawfirm.com


*Attorneys for Plaintiffs and Proposed Class*